UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
NOV 3 0 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES OF AMERICA,

v.

CALVIN CAMPBELL,

Defendant.

**DECISION AND ORDER**

6:06-CR-06105 EAW

## I.  **INTRODUCTION**

Defendant Calvin Campbell ("Defendant"), convicted of a felony drug crime in 2007, faces charges that he violated the terms and conditions of supervised release by possessing and trafficking in illegal narcotics.  On August 2, 2018, New York State Troopers stopped Defendant driving a black Toyota Venza with illegally tinted windows. Ultimately, Defendant's supervising probation officer arrived at the scene, and the Venza was searched, resulting in the discovery of heroin, cocaine, and marijuana packaged for distribution.  Defendant does not challenge the underlying facts related to the discovered narcotics; rather, he contends the search and seizure violated his Fourth Amendment rights. Because the exclusionary rule does not apply to a supervised release proceeding, and because even if it did Defendant's Fourth Amendment rights were not violated, the Court finds Defendant guilty as charged of violating the terms and conditions of supervised release.

## II. PROCEDURAL AND FACTUAL BACKGROUND

Convicted by a plea in 2007 for distributing five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 851, Defendant was sentenced by United States District Judge David G. Larimer on February 13, 2008, to 90 months in the Bureau of Prisons to be followed by eight years of supervised release. (Dkt. 45). After Defendant served his prison sentence, on March 27, 2015, a petition was filed alleging that Defendant violated certain terms and conditions of supervised release. (Dkt. 65). Judge Larimer transferred the case to the undersigned. (Dkt. 66).

On December 1, 2015, Defendant pleaded guilty to violating Condition 1 of the Third Amended Petition, and the Court revoked Defendant's supervised release and sentenced him to 12 months in the custody of the Bureau of Prisons to be followed by 51 months of supervised release. (Dkt. 90). Among the conditions of supervised release imposed pursuant to the Court's Judgment was the mandatory condition that Defendant "shall not commit another federal, state or local crime." (*Id*. at 3). In addition, the Court imposed the following special condition: "The defendant shall submit to a search of his/her person, property, vehicle, place of residence or any other property under his control, based upon reasonable suspicion, and permit confiscation of any evidence or contraband discovered." (*Id*. at 4).

Defendant commenced his 51-month supervised release term on November 4, 2016. (*See* Dkt. 91 at 1). Less than two years into that term, on August 3, 2018, a Petition was

filed alleging that Defendant violated the terms and conditions of supervised release as follows:

| Violation Number | Nature of Noncompliance |
|---|---|
| 1/Mandatory Condition | The defendant shall not commit another federal, state or local crime. |
| | **Details**: On August 2, 2018, Mr. Campbell was pulled over by New York State Troopers in the City of Rochester for traffic violations. He was the sole occupant of the vehicle. In plain view, our office observed three (3) cell phones. During the course of speaking with Mr. Campbell he became agitated and not listening to the Troopers['] commands. As such, they placed him in handcuffs for officer safety reasons. Our office then conducted a search of the vehicle and we located a quantity of heroin, cocaine and marijuana, all packaged for sale. New York State Police arrested the defendant and charged him with two (2) counts of violating NYS Penal Law 220.16, Sub 1 – Criminal Possession Controlled Substances 3rd (Class B felony) and Unlawful Possession of Marijuana (viol.). |
| 2/Mandatory Condition | The defendant shall not commit another federal, state or local crime. |
| | **Details**: As noted in Violation Number One (1) of this petition, Mr. Campbell was in possession of heroin, cocaine and marijuana. This is in violation of Title 21, U.S.C., Section 844 – Simple Possession of a Controlled Substance. |
| 3/Mandatory Condition | The defendant shall not commit another federal, state or local crime. |
| | **Details**: As noted in Violation Number One (1) of this petition, Mr. Campbell was in possession of heroin, cocaine and marijuana. This is in violation of Title 21, U.S.C., Section 841(a)(1) – Possession with Intent to Distribute a Controlled Substance. |

(*Id.* at 1-2).

Defendant's initial appearance occurred on August 8, 2018, at which time he pleaded not guilty to the charges in the Petition. (Dkt. 92). A revocation hearing was held before the undersigned on October 31, 2018. (Dkt. 98). The Government called two witnesses to testify at the hearing: New York State Trooper Peter Ferguson and United States Probation Officer Jeremy Bedette. In addition, the Government introduced six exhibits into evidence as follows:

| | |
|---|---|
| Government Exhibit 1 | Judgment entered December 3, 2015 |
| Government Exhibit 2 | ATLAS email to Officer Bedette dated 8/2/18 |
| Government Exhibit 3 | Phone records of Officer Bedette from 8/2/18 |
| Government Exhibit 4 | Evidence Record |
| Government Exhibit 5 | Monroe Co. Crime Lab Evidence Intake Form |
| Government Exhibit 6 | Monroe Co. Crime Lab Report |

Defendant did not call any witnesses, but he cross-examined Trooper Ferguson and Officer Bedette, and he introduced into evidence an eJusticeNY report that was designated as Defendant's Exhibit A.

On November 14, 2018, the Government and Defendant simultaneously submitted post-hearing memoranda. (Dkt. 99 (Gov't); Dkt. 100 (Defense)).

## III. REVOCATION HEARING TESTIMONY[1]

### A. Testimony of Trooper Ferguson

Trooper Ferguson has been employed by the New York State Police since March 2015. On August 2, 2018, he was driving a marked patrol vehicle in the City of Rochester, working with Trooper Cody Tropey. At approximately 1:30 PM, he conducted a traffic stop on Norton Avenue in the City of Rochester, because the windows of a black Toyota Venza appeared to have less than 70% transparency in violation of New York Vehicle and Traffic Law.[2] Trooper Ferguson approached the driver's side of the Venza and Trooper Tropey approached the passenger's side. Before Trooper Ferguson reached the Venza, Defendant was holding his license out of the driver's side window that had been rolled down about halfway. Defendant was the sole occupant. Trooper Ferguson began to explain to Defendant the reason he had been pulled over (for the alleged illegal tint), and Defendant responded that he should just go write the ticket so that he could get on with his day. Trooper Ferguson did not observe any drugs or anything else that he viewed as suspicious during his initial interaction with Defendant.

---

[1]    A transcript of the hearing has not been prepared, and therefore the Court's summary of the witness testimony is based upon its notes. Of course, if the official transcript differs from the Court's summary, the transcript controls.

[2]    New York Vehicle and Traffic Law § 375(12-a)(b)(2) provides: "No person shall operate any motor vehicle upon any public highway, road or street . . . the sidewings or side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent. . . ."

Trooper Ferguson returned to his police vehicle to run a license and registration check. Trooper Ferguson received information on his mobile data transmitter ("MDT system") that Defendant was on supervised release with contact information for Officer Bedette.[3] Trooper Ferguson telephoned Officer Bedette to advise of the traffic stop, and Officer Bedette indicated that he was just a couple streets away and asked that Trooper Ferguson "sit tight" because Officer Bedette had information about Defendant's alleged involvement with drugs and weapons. Trooper Ferguson estimated that only a minute or two elapsed from the time he stopped Defendant's vehicle until when he called Officer Bedette.

Officer Bedette arrived on the scene within approximately 5-10 minutes of the initial stop and approached Defendant's vehicle. According to Trooper Ferguson, Defendant exited the vehicle yelling; he was upset, and he was screaming at cars on the side of the road and people in parking lots to have them contact his girlfriend. After telling Defendant to calm down several times, with no success, Trooper Ferguson handcuffed Defendant and placed him in his police vehicle "for officer safety."

Trooper Ferguson became aware that there was going to be a search of the Venza, but he testified that he did not participate in the search. He testified that he became aware

---

[3] The MDT system apparently instructed to contact the probation officer within 24 hours, and it also indicated that an arrest should not be made based on the information about an individual's supervised release status. (*See* Def. Ex. A). Trooper Ferguson elected to contact Officer Bedette immediately.

that contraband was discovered and he took custody of the material and secured it at the police station. The narcotics were sent to the Monroe County Crime Laboratory for testing.

According to Trooper Ferguson, Defendant was issued a ticket for driving with illegally tinted windows in violation of New York's Vehicle and Traffic Law § 375(12-a)(b)(2). The tint on the windows, as reflected by the ticket, was tested with a tint meter as 18%, meaning only 18% of visible light was allowed through the Venza's side windows.[4]

### B.    Testimony of Officer Bedette

Officer Bedette has been employed as a U.S. Probation Officer for 11 years. In that capacity, he supervises defendants who are on pretrial supervision awaiting trial and those who have been released from prison and are serving on supervised release.

Officer Bedette began supervising Defendant when he was released from the Bureau of Prisons in November 2016. On or about November 7, 2016, Officer Bedette personally interviewed Defendant and went over all the conditions of supervised release. Defendant had no questions about the conditions. Defendant signed the following statement: "Upon a finding of a violation of . . . supervised release, I understand that this court may (1) revoke supervision, [and/or] (2) extend the terms of supervision. . . . These conditions have been read to me. I fully understand the conditions and have been provided a copy of them." (*See* Gov't Ex. 1).

---

[4]     Defense counsel requested at the hearing a copy of the Uniform Traffic Ticket that was issued to Defendant, and it was subsequently provided to the Court and counsel by the Government.

At the end of July 2018, a confidential informant ("CI-1") notified Officer Bedette

that Defendant was robbing drug dealers in the City of Rochester. Having worked with

CI-1 previously, Officer Bedette considered him/her reliable.[5] Also in late July 2018,

---

[5] The Court allowed Officer Bedette to testify concerning information he learned from two confidential informants, over Defendant's objection. The testimony was not offered for its truth to prove that Defendant violated the terms and conditions of supervised release by, for instance, robbing drug dealers. In other words, the information supplied by the confidential informants did not serve as the basis for the charged supervised release violations, and it was not admitted to prove Defendant's guilt. Rather, the testimony was non-hearsay going to Officer Bedette's state of mind to support the Government's contention that there was reasonable suspicion to detain Defendant during the traffic stop and search the Venza. Under the circumstances, the testimony was admissible and Defendant was not entitled to disclosure of the identity of the confidential informants. *See McCray v. Illinois*, 386 U.S. 300, 312 (1967) (neither evidentiary rules nor Constitution compel disclosure of identity of informant at suppression hearing where arrest and search occurs in reliance upon facts supplied by informant); *United States v. Pierce*, 493 F. Supp. 2d 611, 620 (W.D.N.Y. 2006) ("[T]he prosecution is not required to disclose the identity of a confidential informant to assist a defendant in attacking, at pretrial suppression hearings, probable cause for a warrantless arrest and search."); *see generally Roviaro v. United States*, 353 U.S. 53, 60-61 (1957) ("Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the [informant's] privilege must give way"); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) ("[A] defendant is generally able to establish a right to disclosure 'where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence.' . . . But disclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be material to the defense." (quoting *United States v. Russotti*, 746 F.2d 945, 950 (2d Cir. 1984))).

In fact, even if the testimony about the confidential informants had been offered for purposes of proving the substantive violations of supervised release, there is an argument that good cause existed for introduction of the statements through hearsay and without requiring the confidential informants to testify. *See United States v. Harris*, 838 F.3d 98, 107-08 (2d Cir. 2016) (while neither the Confrontation Clause nor the Federal Rules of Evidence strictly apply to out-of-court statements introduced at revocation hearing, "a defendant has 'the right to confront and cross-examine adverse witnesses (unless the [court] specifically finds good cause for not allowing confrontation).'" (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972))); *United States v.*

Officer Bedette learned from another probation officer that another confidential source ("CI-2") advised that Defendant was dealing drugs out of a rental property that he owned on Berlin Street, he was supplying an auto repair garage on Norton Street with drugs, and he was robbing drug dealers in the City of Rochester. The Norton Street garage was next to Sabrino's Restaurant where Defendant worked. CI-2 provided the other probation officer with accurate information concerning Defendant's address and vehicles.

The U.S. Probation Office subscribes to ATLAS (Access to Law Enforcement Automated System) which is a system that provides an alert to the supervising probation officer anytime a license plate is run that is tied to an individual under supervision. On August 2, 2018, Officer Bedette received an ATLAS email alert "in real time" at 1:28 PM when Trooper Ferguson ran Defendant's license and registration. (*See* Gov't Ex. 2). Three minutes later, at approximately 1:31 PM, Officer Bedette received a telephone call from Trooper Ferguson. (*See* Gov't Ex. 3). Officer Bedette was around the corner from the traffic stop, on Portland Avenue. Trooper Ferguson advised Officer Bedette that Defendant was "pretty irate." Officer Bedette told Trooper Ferguson that he had information that Defendant was engaged in drug sales in the City of Rochester and that he potentially had a firearm. Officer Bedette asked Trooper Ferguson to hold Defendant at the scene, and within a couple minutes, Officer Bedette arrived at the scene with another probation officer

---

*Carthen*, 681 F.3d 94, 100 (2d Cir. 2012) ("[A] determination of 'good cause' requires the court to balance 'the defendant's interest in confronting the declarant[] against[] . . . the government's reasons for not producing the witness and the reliability of the proffered hearsay.'" (alterations in original) (quoting *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006))).

(Officer Greczyn). When Officer Bedette arrived, Defendant was the sole occupant of the Venza, seated in the driver's seat.

Officer Bedette approached the vehicle and Defendant was "pretty irate." Officer Bedette asked Defendant what was wrong and he responded that they pulled him over for a tint violation and he "just wanted his fucking ticket and wanted to be on his way." Officer Bedette observed three cell phones in the center console of Defendant's vehicle. Officer Bedette testified that he was concerned about the presence of the cell phones because based on his experience and training, he knows that multiple cell phones can represent involvement in the drug trade, and furthermore, he believed that only one of the cell phones had been reported to him by Defendant. Officer Bedette asked Defendant about the three cell phones, and he responded that "maybe they're my son's or something."

Officer Bedette asked Defendant to step out of the Venza, and he was brought to the back of the vehicle. At that point Defendant was yelling at cars passing by to call his wife. The Troopers told him several times to stop, but Defendant kept yelling, and as a result Defendant was put in handcuffs and placed in the back of the police vehicle.

Based on the prior information from the confidential informants and the three cell phones, Officer Bedette decided to request authorization from his supervisor to conduct a search of the Venza. Officer Bedette contacted his supervisor, Thomas Langelotti, using his cell phone at approximately 1:38 PM (about seven minutes after receiving the initial call from Trooper Ferguson), and Officer Langelotti provided Officer Bedette with authorization to search the Venza at approximately 1:45 PM. (*See id.*).

- 10 -

Officer Bedette went to the police vehicle where Defendant was seated and advised him that they were going to search the Venza and asked if they were going to find anything illegal. Defendant responded that he just wanted "his fucking ticket" and he wanted to be on his way. Officer Bedette again asked Defendant if they would find anything illegal, and Defendant just stared back and refused to answer.

Officer Bedette testified that he, Officer Greczyn, and the Troopers searched the vehicle.[6] Officer Bedette estimated that the search occurred approximately 10-15 minutes after he was initially contacted by Trooper Ferguson. The search resulted in the discovery of suspected drugs that were packaged for sale. Item No. 1 was a plant-like material in five plastic bags that tested positive for marijuana. Item No. 2 was a plastic bag containing rice and nine clear Ziploc bags containing white chunky powder and rock-like material that tested positive for cocaine. Item No. 3 was a plastic bag containing rice, two green wax

---

[6]    According to the Court's notes, Officer Bedette testified that the Troopers assisted with the search, whereas Trooper Ferguson testified that he and his partner did not assist with the search. Neither party focused on this discrepancy during the hearing, nor has either party cited to this discrepancy in the post-hearing submissions. Nonetheless, for the sake of completeness, the Court notes that it credits Officer Bedette's version of events because Officer Bedette displayed a sharper recollection of the events, and he was able to provide specific details (indicating, for instance, that it was the Troopers who searched the front of the vehicle and discovered suspected narcotics hidden behind the stereo in the dashboard). The Court also notes that the involvement of the Troopers in the search has no impact on its analysis of the reasonableness of the search for Fourth Amendment purposes—an issue that, again, was not raised. *See United States v. Newton*, 369 F.3d 659, 666-67 (2d Cir. 2004) (rejecting defendant's challenge to search of parolee conducted by parole officers enlisting assistance from police officers, explaining that "the duties and objectives of probation/parole officers and other law enforcement officials, although distinct, may frequently be 'intertwined' and responsibly require coordinated efforts." (quoting *United States v. Reyes*, 283 F.3d 446, 463-64 (2d Cir. 2002))).

envelopes, two black rubber bands, and a dollar bill, with a grey powder that tested positive for fentanyl, heroin, and tramadol. (*See* Gov't Ex. 4, 5, & 6).

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

"Revocation proceedings are not deemed part of a criminal prosecution, and, therefore, defendants in such proceedings are not entitled to 'the full panoply of rights' that criminal defendants generally enjoy." *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). The Government must prove the alleged violation of supervised release by a preponderance of the evidence. *Id.* at 99-100; *see* 18 U.S.C. § 3583(e)(3) (court may revoke supervised release term and impose prison sentence if the court "finds by a preponderance of the evidence that the defendant violated a condition of supervised release"); *United States v. Carlton*, 442 F.3d 802, 807 (2d Cir. 2006) ("Because revocation proceedings generally have not been considered criminal prosecutions, they have not been subject to the procedural safeguards, including the rights to trial by jury and to accusations proved beyond a reasonable doubt, associated with a criminal trial.").

Defendant is alleged to have violated three separate statutes. Violation No. 1 alleges that Defendant violated New York State Penal Law § 220.16(1), which provides that a person is guilty of criminal possession of a controlled substance in the third degree if he knowingly and unlawfully possessed a narcotic drug with intent to sell it. To establish a violation of this statute, the Government must prove: (1) the defendant possessed the alleged narcotics; (2) the defendant did so knowingly and unlawfully; and (3) the defendant

possessed the alleged narcotics with the intent to sell them. CJI2d[NY] Penal Law § 220.16(1), available at http://www.nycourts.gov/judges/cji/2-PenalLaw/220/220-06%281%29.pdf (last visited Nov. 30, 2018).

Violation No. 2 alleges a violation of 21 U.S.C. § 844, which provides that it shall be unlawful for any person to knowingly and intentionally possess a controlled substance. Thus, to establish a violation of this statute, the Government must prove two elements: (1) that the defendant possessed narcotic drugs; and (2) that the defendant knew that he possessed narcotic drugs.

Violation No. 3 alleges a violation of 21 U.S.C. § 841(a)(1), which makes it unlawful to possess with intent to distribute a controlled substance. To prove a violation of this provision, the Government must establish the following three elements: (1) that the defendant possessed narcotic drugs; (2) that the defendant knew that he possessed narcotic drugs; and (3) that the defendant possessed the narcotic drugs with the intent to distribute them. *See United States v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998).

This case is unusual in that—as all parties concede—the facts are essentially undisputed. Defendant does not contest that narcotic drugs packaged for resale were secreted and hidden in the Venza, over which he had custody and control and in which he was the sole occupant. As conceded by defense counsel at the conclusion of the revocation hearing, if the evidence seized from the Venza is not suppressed, then Defendant is guilty of the charged violations of supervised release. In other words, based on the circumstances surrounding the evidence seized, the Government established by a preponderance of the

evidence that on August 2, 2018, in the City of Rochester, Defendant knowingly and unlawfully possessed heroin, cocaine, and marijuana with the intent to distribute and sell the narcotics.

However, that does not end the inquiry—or better stated, the inquiry as to Defendant's guilt does not even start until the Court first determines whether the evidence seized should be suppressed because, as Defendant contends, his Fourth Amendment protections against unreasonable searches and seizures were violated. For the reasons set forth below, the Court concludes that the exclusionary rule does not apply to this supervised release proceeding, and even if it did apply, Defendant's Fourth Amendment rights were not violated.

A.    **The Exclusionary Rule Does Not Apply**

The Government argues that the exclusionary rule as recognized by the Supreme Court in *Mapp v. Ohio*, 367 U.S. 643 (1961), does not apply to this supervised release violation proceeding, and therefore even if the evidence was obtained in violation of Defendant's Fourth Amendment rights, it should not be suppressed. (Dkt. 99 at 4-6). Defendant counters that while the Supreme Court concluded in *Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357 (1998), that the exclusionary rule did not bar the introduction at a parole revocation hearing of evidence seized in violation of a parolee's Fourth Amendment rights, the present situation is distinguishable. (Dkt. 100 at 2-3).

As all parties recognize, the Supreme Court determined in *Scott* that "the federal exclusionary rule does not bar the introduction at parole revocation hearings of evidence

- 14 -

seized in violation of parolees' Fourth Amendment rights." 524 U.S. at 364. The Supreme Court explained that "the governments' use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution" but rather the violation occurs when the illegal search or seizure occurs. *Id.* at 362. Thus, the exclusionary rule is "a judicially created means of deterring illegal searches and seizures" and as a result, being a rule that "is prudential rather than constitutionally mandated," it is applied "only where its deterrence benefits outweigh its 'substantial social costs.'" *Id.* at 363 (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)). Accordingly, the Supreme Court emphasized that it has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials" and, in *Scott*, concluded that it should not apply to parole revocation proceedings. *Id.* at 364, 369.

The Second Circuit Court of Appeals has not ruled on whether the exclusionary rule applies to supervised release proceedings, *United States v. Lewis*, 712 Fed. Appx. 83, 83 (2d Cir. 2018) ("we have yet to decide whether the exclusionary rule applies to supervised release revocation proceedings"), although it may be poised to do so in an appeal currently pending in *United States v. Hightower*, 312 F. Supp. 3d 426 (S.D.N.Y. 2018), *appeal docketed*, 2d Cir. 18-2238. As noted by the District Court in *Hightower*, several district courts in this Circuit have refused to apply the exclusionary rule to supervised release proceedings. 312 F. Supp. 3d at 428 (collecting cases). Moreover, several courts of appeals in other circuits have concluded that the exclusionary rule does not generally apply to supervised release proceedings. *See United States v. Charles*, 531 F.3d 637, 640 (8th Cir.

- 15 -

2008) (exclusionary rule inapplicable to supervised release proceeding where "there is no evidence nor allegation of harassment"); *United States v. Hebert*, 201 F.3d 1103, 1104 (9th Cir. 2000) ("We conclude that the Court's reasoning in *Scott* applies equally to suppression of evidence in federal supervised release proceedings. . . ."); *United States v. Armstrong*, 187 F.3d 392, 394 (4th Cir. 1999) ("[W]e agree with the district court that *Scott* requires that the exclusionary rule not be extended to federal supervised release revocation proceedings."); *United States v. Montez*, 952 F.2d 854, 857 (5th Cir. 1992) (holding pre-*Scott* that exclusionary rule does not apply to federal supervised revocation hearings). Likewise, district courts in those circuits where the court of appeals has not reached the issue, have consistently concluded that the exclusionary rule does not apply to supervised release proceedings. *See, e.g.*, *Forney v. United States*, Civ. No. 13-6239 (NLH), 2015 WL 1808487, at *5 (D.N.J. Apr. 21, 2015) (holding the federal exclusionary rule does not bar the introduction of evidence seized in violation of Fourth Amendment rights at a revocation of supervised release hearing); *United States v. Allison*, No. 05-20112-JWL, 2015 WL 1608652, at *2 (D. Kan. Apr. 10, 2015) (holding the exclusionary rule does not apply to supervised release revocation hearings); *United States v. Jimenez-Torres*, Cr. No. 06-135(PG), 2010 WL 2650318, at *4 (D.P.R. June 30, 2010) ("[W]e also hereby hold that the exclusionary rule does not apply to supervised release revocation hearings and does not forbid the use of evidence obtained in violation of the Fourth Amendment in such proceedings."); *United States v. Quinn*, Nos. 01-20122-JWL, 06-3262-JWL, 2007 WL 437734, at *4 (D. Kan. Feb. 6, 2007) ("[T]he court believes that the Tenth Circuit . . . would

conclude that the exclusionary rule does not apply in [supervised release revocation] proceedings.").

Indeed, the Court's research has not revealed any case where a court has applied the exclusionary rule to a supervised release proceeding. There are many similarities between a state parole proceeding and a federal court supervised release proceeding. *See United States v. Elder*, 17-CR-05-A, 2018 WL 833132, at *2-3 (W.D.N.Y. Feb. 13, 2018) (citing to *Samson v. California*, 547 U.S. 843 (2006) and *United States v. Reyes*, 283 F.3d 446 (2d Cir. 2002) for the proposition that for Fourth Amendment purposes there is little difference between state parole and federal supervised release, which are "in many ways, both an extension of prison"). Yet, there are also differences, and as a practical matter, the Court questions the reasoning for placing limits of reasonable suspicion on a supervised release search condition if, in fact, evidence seized from an unconstitutional search of an individual under supervision would be admitted in any event.

Nonetheless, based upon the overwhelming caselaw as cited above, the Court concludes that the principles of *Scott* apply with equal force in the supervised release context, and the exclusionary rule does not apply to Defendant's supervised release proceeding. In other words, the exclusion of the evidence seized from Defendant would hamper the Government's ability to ensure compliance with the conditions of supervised release by permitting Defendant to avoid the consequences of his continued drug trafficking, and the minimal deterrence benefits of applying the exclusionary rule in this

context would not outweigh the costs of expanding the nature of supervised release proceedings. *See Scott*, 524 U.S. at 367.

## B. The Search of Defendant's Vehicle Did Not Violate the Fourth Amendment

Because the Second Circuit has not yet opined on the applicability of the exclusionary rule to the supervised release context, out of an abundance of caution the Court will address the alternative issue of whether Defendant's Fourth Amendment rights were violated. In that regard, Defendant raises two arguments concerning the violation of his Fourth Amendment rights: (1) Defendant contends that he was unreasonably detained; and (2) the search of his vehicle was not supported by reasonable suspicion. The Court will address each of these arguments in turn.

### 1. *Defendant's Detention Was Not Unreasonable*

Again, the facts are largely undisputed. After being pulled over by Trooper Ferguson, Defendant remained in the Venza at the side of the road while Trooper Ferguson returned to his police vehicle and performed a license and registration check. Upon learning that Defendant was on supervised release, Trooper Ferguson telephoned Officer Bedette who asked Trooper Ferguson to keep Defendant at the scene because Officer Bedette had information concerning Defendant's alleged involvement with drugs and guns and he wanted to speak with Defendant. This phone call occurred approximately five minutes or less after Defendant was initially stopped. Officer Bedette was on the scene in a matter of minutes, and approximately 10 minutes after Trooper Ferguson initially ran the license and registration check, Officer Bedette sought permission from his supervisor to

- 18 -

search the vehicle. At 1:45 PM (approximately 15 minutes after the initial traffic stop), Officer Bedette received permission to search the vehicle.

Like a stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 1614 (2015) (citations omitted). In other words, a traffic stop may not ordinarily last any longer than necessary to address the traffic infraction. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Tasks considered within the realm of an ordinary traffic stop include determining whether to issue a traffic ticket, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* at 1615.

"An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* As explained by the Supreme Court, the Fourth Amendment will tolerate unrelated investigations so long as the roadside detention is not lengthened as a result. *Id.* Thus, "the 'critical question' is not whether the unrelated investigation 'occurs before or after the officer issues a ticket,' but whether conducting the unrelated investigation 'prolongs—*i.e.*, adds time to—the stop.'" *United States v. Gomez*, 877 F.3d 76, 89 (2d Cir. 2017) (quoting *Rodriguez*, 135 S. Ct. at 1616).

A traffic stop may be extended "for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015). "The existence of reasonable suspicion is not a purely legal issue; rather, it is a mixed question of law and fact dependent on the totality of the circumstances." *Gomez*, 877 F.3d at 92. "Like probable cause, reasonable suspicion is determined based on the totality of the circumstances but 'the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)). *See Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

Of course, reasonable suspicion must be "supported by articulable facts that criminal activity may be afoot," and it cannot be based on "inchoate suspicion or [a] mere hunch." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000)). While a court should evaluate the "totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and

training,'" a court should not "merely defer to the police officer's judgment." *Id.* (quoting *Bayless*, 201 F.3d at 133).

In this case, up until the point in time when Trooper Ferguson contacted Officer Bedette, the length of the stop was driven by the tasks associated with normal activities related to the alleged traffic infraction. Indeed, Trooper Ferguson testified that when he contacted Officer Bedette, he had not even decided whether to issue Defendant a ticket for illegally tinted windows. Upon speaking with Officer Bedette, Trooper Ferguson agreed to keep Defendant at the scene until Officer Bedette arrived, which occurred within a matter of minutes.

Thus, the record is clear that up until the point in time that Trooper Ferguson contacted Officer Bedette, Defendant was not detained any longer than necessary for the normal activities associated with the traffic violation—indeed, Defendant does not attempt to argue otherwise. It is less clear whether the time between Trooper Ferguson's call to Officer Bedette and Officer Bedette's arrival at the scene, extended the length of the traffic stop. Officer Bedette, who was around the corner from the stop, arrived on the scene in a matter of minutes, and the record is not clear whether Trooper Ferguson continued to conduct traffic-related activities after calling Officer Bedette and awaiting his arrival. Indeed, Trooper Ferguson's recollection as to his activities during this time period appeared somewhat vague, not recalling, for instance, whether he informed Defendant that he had contacted Officer Bedette and planned to await his arrival.

However, assuming that the time between the call to Officer Bedette and his arrival lengthened the traffic stop, this Court concludes that it was constitutionally justified based upon reasonable suspicion. Namely, Officer Bedette had credible information from two confidential informants that Defendant was engaged in illegal activities, and Officer Bedette communicated this information to Trooper Ferguson with the request that Defendant be kept at the scene so that Officer Bedette could question him. Officer Bedette learned from CI-1 that Defendant was robbing drug dealers, and from CI-2 that Defendant was dealing drugs out of a rental property that he owned on Berlin Street, Defendant was supplying an auto repair garage on Norton Street with drugs, and he was robbing drug dealers. Officer Bedette knew CI-1 to be reliable based upon past experience, and there was corroborating evidence that supported the reliability of CI-2—namely, Officer Bedette knew that the restaurant where Defendant worked was next to the garage, he knew of the rental property Defendant owned on Berlin Street, the alleged robbing of drug dealers was similar to the information reported by CI-1, and CI-2 reported accurate information concerning Defendant's address and vehicles.[7]

"Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.'" *United States v. Elmore*, 482 F.3d at 179 (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)). Like an

---

[7] Defendant appears to suggest that because Officer Bedette possessed the information from the confidential informants in late July 2018 but had not acted upon it before the traffic stop, this somehow negates any basis to find reasonable suspicion. The Court disagrees. The fact that reasonable suspicion may have existed in late July, does not mean that the suspicion was any less reasonable by early August.

assessment in the probable cause context, "courts must assess whether an informant's tip establishes reasonable suspicion under the totality of the circumstances approach set forth in *Illinois v. Gates*, 462 U.S. 213 (1983), though obviously a lesser showing is required."

*Id.* As explained by the Second Circuit in *Elmore*:

> Under the totality of the circumstances approach . . . informants do not all fall into neat categories of *known* or *anonymous*. Instead, it is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable, . . . no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous, . . . a significant amount of corroboration will be required. However, when the informant is only partially known (i.e., her identity and reliability are not verified, but neither is she completely anonymous), a lesser degree of corroboration may be sufficient to establish reasonable suspicion.

*Id.* at 181.

Here, based on the information possessed by Officer Bedette, as communicated to Trooper Ferguson, there was reasonable suspicion to justify prolonging the traffic stop by a few minutes so that Officer Bedette could arrive at the scene and question Defendant further. *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."). Moreover, as discussed further below, once Officer Bedette arrived at the scene, Defendant's behavior and the presence of three cell phones in the Venza, coupled with the

information from the confidential informants, justified extending the length of the traffic stop to search the Venza.

### 2. The Search of Defendant's Vehicle Was Supported by Reasonable Suspicion

"It is well settled that Fourth Amendment protections extend only to unreasonable government intrusions into legitimate expectations of privacy." *United States v. Reyes*, 283 F.3d at 457 (quotation, alteration, and citation omitted). "As a general matter, '[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations.'" *United States v. Lambus*, 897 F.3d 368, 402 (2d Cir. 2018) (alteration in original) (quoting *Grady v. North Carolina*, 135 S. Ct. 1368, 1371 (2015)). "For an individual's expectation of privacy to be legitimate, he must have exhibited an actual (subjective) expectation of privacy and the expectation must be one that society is prepared to recognize as reasonable." *Reyes*, 283 F.3d a 457 (quotations and citations omitted).[8]

---

[8] "A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a legitimate expectation of privacy in the place searched." *United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (quotation omitted). *See United States v. Perea*, 986 F.2d 633, 639-40 (2d Cir. 1993) (discussing need to show legitimate expectation of privacy in location or object searched). Here, Defendant never made any showing that he had a legitimate expectation of privacy in the vehicle. Nonetheless, since the Government did not raise the issue and since the suppression-aspect of Defendant's argument was folded into the revocation hearing and not handled through a separate formal motion, the Court will presume that Defendant made the necessary showing.

An individual on supervised release has a "significantly diminished" expectation of privacy, *Lambus*, 897 F.3d at 402, and as a result, the probable cause requirements of the Fourth Amendment do not generally apply to searches by probation officers in executing their supervisory duties consistent with search conditions imposed as part of supervised release. *See Reyes*, 283 F.3d at 462 (holding that probable cause requirements of Fourth Amendment do not apply to a federal probation officer conducting a home visit pursuant to a convicted offender's conditions of supervised release). *See also United States v. Knights*, 534 U.S. 112, 121 (2001) (no more than reasonable suspicion required to conduct search of probationer's house).

Upon arriving at the scene, Officer Bedette observed three cell phones in the Venza's center console, only one of which had been reported to Officer Bedette and which suggested to Officer Bedette based on his experience and training possible evidence of drug trafficking. Defendant was vague as to the purpose of the multiple cell phones, and he acted in an irate and belligerent manner, ultimately resulting in his being handcuffed and placed in the back of Trooper Ferguson's vehicle. Based on these factors, coupled with the information from the confidential informants, Officer Bedette requested permission from his supervisor to search Defendant's vehicle pursuant to the search condition of Defendant's supervised release, allowing for a search "based upon reasonable suspicion." (Dkt. 90 at 4). Under the circumstances, the Court easily concludes that reasonable suspicion justified the search of Defendant's vehicle. Indeed, "courts have routinely found specific information received by probation officers from confidential

informants and eyewitnesses provides reasonable suspicion to justify a search." *United States v. Chandler*, 164 F. Supp. 3d 368, 379 (E.D.N.Y. 2016) (citing *United States v. Townsend*, 371 F. App'x 122, 125 (2d Cir. 2010), *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007), and *United States v. Washington*, No. 12 CR 146 (JPO), 2012 WL 5438909, at *9 (S.D.N.Y. Nov. 7, 2012)). Here, more than just confidential informants were relied upon to justify the search—Defendant's own belligerent and uncooperative behavior, as well as the unexplained presence of three cell phones in the Venza, plainly satisfied the reasonable suspicion standard and justified the search of the vehicle.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the exclusionary rule does not apply to Defendant's supervised release proceeding, but even if it did apply, Defendant's Fourth Amendment rights were not violated. Accordingly, the evidence of narcotics trafficking seized from Defendant's vehicle during the stop on August 2, 2018, is admissible. Based on that evidence and the circumstances surrounding it, the Court concludes that the Government established by a preponderance of the evidence that Defendant violated the terms and conditions of his supervised release, and the Court finds Defendant guilty of each of the charged violations as set forth in the Petition.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  November 30, 2018
        Rochester, New York